UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

KARNISHA WILLIAMS

VERSUS

FRANCISCAN MISSIONARIES OF
OUR LADY HEALTH SYSTEM, INC.,
ET AL.

CIVIL ACTION

NO. 18-323-JWD-EWD

## RULING AND ORDER

Pending before the Court is the Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed by Defendants Franciscan Missionaries of Our Lady Health System, Inc. and Our Lady of the Lake Hospital, Inc. (Doc. 11). Plaintiff Karnisha Williams opposes the motion. (Doc. 15). The defendants have filed a reply brief in support of their motion. (Doc. 18). Oral argument is not necessary. After careful consideration of the parties' arguments, the factual allegations, and the applicable law, and for the following reasons, the defendants' motion (Doc. 11) is granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Karnisha Williams, an African American female, filed suit on March 21, 2018, against Franciscan Missionaries of Our Lady of Health System, Inc. ("FMOLH") alleging that she was discriminated against on the basis of her race and sex during the course of her employment at Our Lady of the Lake Hospital in Baton Rouge, Louisiana. (Doc. 1). On April 11, 2018, she filed an amended complaint, adding Our Lady of the Lake Hospital, Inc. ("OLOL") as a defendant. (Doc. 4).

In April 2015, Williams interviewed with OLOL's Kathleen Husain[1] for a Heart Vascular Cardiovascular Unit ("HVCU") position. (Doc. 4 at 2). Williams told Husain that she was interested in a position in the Intensive Care Unit ("ICU"). (*Id.*). Husain informed Williams that newly hired nurses typically work in the Telemetry division for about one year and then transition to the ICU. (*Id.*). In June 2015, Williams completed her last semester of "school" with an ICU nurse in the HVCU and subsequently began her orientation as a registered nurse in August 2015. (*Id.*)

In or around September 2015, Williams informed Husain that she did not feel comfortable working with Ashley Hayes, who she "believed was behaving in a condescending manner towards her." (Doc. 4 at 2). Williams heard from several individuals that Hayes would speak about how she hated working with Williams. (*Id.*). In November 2015, Williams completed her orientation and began working in the Heart Vascular Ambulatory Unit two months later. (*Id.* at 2–3). In April 2016, she became a member of the Telemetry Council. (*Id.* at 3). Subsequently, in May 2016, she completed Advanced Cardiac Life Support ("ACLS") training and "received a positive annual evaluation." (*Id.*). In June 2016, she became a Telemetry Council Chair. (*Id.*).

In July 2016, Williams reported being "bullied" by a white coworker to her supervisor, John Wilson. (Doc. 4 at 3). Williams informed Husain and Wilson that the coworker, Rebecca Musika, the charge nurse, "stated that the family of [Williams'] patient had requested a new nurse." (*Id.*). Williams later learned, however, that the family did not actually make the request. (*Id.*). In fact, after Williams was replaced, the family requested Williams back. (*Id.*). This request was denied by Musika. (*Id.*). Wilson confirmed that the family wanted Williams to care for their relative. (*Id.*).

---

[1] Husain's name is spelled as "Husain" and "Hussain" in the amended complaint. The Court will refer to her as "Husain."

In August 2016, near the end of her first year in the Telemetry division, Williams asked Husain about the possibility of training for, and eventually transferring to, a position in the ICU. (Doc. 4 at 3). Husain then met with David Salbador, the night supervisor, who informed her that Williams was not ready to transfer to the ICU. (*Id.* at 3–4). Williams believes that Salbador informed Husain that Williams was not ready to be transferred because she isolated herself from the other ICU nurses by not sitting in the nurse's station or engaging with them during her shifts. (*Id.* at 4). Thus, according to Williams, "there was no reason to deny the transfer based on skill or training," and the decision was based on race. (*Id.*). Williams later found out that certain white coworkers without an ACLS certification were permitted to train for the ICU. (*Id.*). As a result, she requested to be transferred to another unit. (*Id.*). The coworkers are not identified.

Williams alleges that she "had begun to be bullied by the other white nurses on the unit and made complaint [sic]," but does not specify which unit or to whom she made a complaint. (Doc. 4 at 4). Williams met with the Chief Nursing Officer, Nicole Telhard, "to discuss her concerns regarding her career advancement." (*Id.*). She also met with Chief Operating Officer Terrie Sterling and complained "that she was unable to advance in her nursing career like white co-employees who had advanced to the ICU training." (*Id.*). Nevertheless, "[n]o action was taken to allow Mrs. Williams to advance in the same manner as other white co-employees in that unit." (*Id.* at 4–5). As a result, Williams left OLOL in December 2017. (*Id.* at 5).

On July 11, 2017, Williams filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against "Our Lady of the Lake Reg. Med. Ctr." alleging discrimination on the basis of race and sex. (Doc. 4-1). She amended the charge on August 1, 2017, to add a claim for retaliation, but did not attach the amended charge to her complaint.

(Doc. 4 at 5). On December 21, 2017, the EEOC issued its Dismissal and Notice of Rights, permitting Williams to file a lawsuit within 90 days. (Doc. 4-1 at 3).

Williams asserts claims for race and sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. (Doc. 4 at 1.) Williams also asserts state-law claims for intentional infliction of emotional distress pursuant to La. C.C. Art. 2315 and employment discrimination under La. R.S. 23:332. (*Id.* at 5–6.)

## II. STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pled factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). To defeat a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is "plausible on its face" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Factual allegations need not be detailed, but "must be enough to raise a right to relief above the speculative level," *id.*, and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient. *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

### A. Franciscan Missionaries of Our Lady Health System

FMOLH alleges that it, alone, should be dismissed on two separate but related bases: (1) Williams has not adequately alleged that it was her employer and was responsible for any of the employment decisions at issue; and (2) Williams did not exhaust her administrative remedies by failing to name FMOLH in her EEOC charge. (Doc. 11-1 at 6–8). Because the Court agrees with FMOLH that Williams has not adequately alleged that it was her employer and was responsible for any of the employment decisions forming the basis of her lawsuit, the Court need not address the alternative argument.

It is axiomatic that under Title VII, "generally only employers may be liable" for employment discrimination. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). In the Fifth Circuit, when two entities are both alleged to be employers, employer status is determined by the following four factors: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Id.* at 344. Most important is the second factor, which courts "boil down to an inquiry of what entity made the final decisions regarding employment matters related to the person claiming discrimination." *Id.* (internal quotation marks omitted).

FMOLH is correct that, outside the stray reference to FMOLH and OLOL sharing "an identity of interest," Williams' allegations lack any actual facts from which it can be inferred that FMOLH was Williams' employer such that it could be subject to liability. Williams makes no allegations regarding FMOLHL and OLOL's operations, labor relations, management, or ownership shedding any light on the continuity of interest (or lack thereof) that might exist between the two organizations. But the Court is not permitted to assume that because there is *some*

relationship between FMOLH and OLOL, such as a parent-subsidiary relationship, they automatically constitute a single employer for Title VII purposes. Indeed, even evidence of common management and ownership by itself is insufficient to overcome the "strong presumption that a parent corporation is not the employer of its subsidiary's employees." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997). And Williams specifically alleges OLOL to be her "employer" in the amended complaint (Doc. 4 at 1). Accordingly, the onus was on her to allege facts supporting the inference that FMOLH "made the final decisions regarding the employment matters" she complains of. *Turner*, 476 F.3d at 344. Thus, Williams' Title VII/§ 1981 claims against FMOLH are dismissed without prejudice.[2]

## B. Louisiana Employment Discrimination Law

Next, the defendants assert that they are nonprofit organizations exempt from the Louisiana Employment Discrimination Law's ("LEDL") definition of "employer." (Doc. 11-1 at 8–9). Williams responds by arguing, without any supporting authority, that "entire branches of these entities are undecidedly for-profit limited liability companies, and are registered as such with the Louisiana Secretary of State." (Doc. 15 at 6). She also asserts that Our Lady of the Lake Physician Group, LLC, which is not a party to this lawsuit, "is a named limited liability company with the same address and same registered agent as Defendant OLOL registered as such with the Secretary of State." (*Id.*).

The LEDL explicitly provides that its provisions do not apply to "[e]mployment of an individual by a private educational or religious institution or any nonprofit corporation." La. R.S. § 23:302(2)(b). Importantly, Williams alleges in the amended complaint that OLOL is a

---

[2] Because Williams has alleged no other facts against FMOLH specifically, this analysis applies to all remaining claims against it. In any event, all such claims fail to state a claim upon which relief can be granted for the reasons that follow.

"Louisiana non-profit corporation." (Doc. 4 at 1). In a nearly identical situation, where the plaintiff alleged in the complaint and amended complaint that OLOL was a nonprofit organization, a court in this district concluded that OLOL could not be considered an "employer" as that term is defined by the LEDL. *See Wilson-Robinson v. Our Lady of the Lake Reg. Med. Ctr., Inc.*, No. 10-584, 2011 WL 6046984, at *2 (M.D. La. Dec. 6, 2011) ("Viewing the pleadings in the light most favorable to plaintiff, the Court concludes that defendant is a nonprofit corporation and thus not an 'employer' for purposes of §§ 23:302 and 23:967."). The Court here, unable to simply disregard Williams' allegation that OLOL is a "non-profit organization," reaches the same conclusion. Accordingly, Williams' LEDL claims are dismissed without prejudice.[3]

## C. Title VII and 42 U.S.C. § 1981

"The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). The only "substantive differences between the two statutes [is] their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). As neither of these differences is relevant here, the Court analyzes both claims jointly.

### 1. Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees on the basis of race or sex, among other characteristics. 42 U.S.C. § 2000e–2(a). When relying on circumstantial evidence of discrimination, a Title VII/§ 1981 plaintiff must first establish a *prima facie* case of employment discrimination: (1) she belongs to a protected class;

---

[3] Even if the Court were to reach a different result, because "the analysis applicable to . . . Title VII claims also governs" LEDL claims, *Minnis v. Bd. of Supervisors of La. State Univ. and Agric. and Mech. Coll.*, 55 F. Supp. 3d 864, 884–85 (M.D. La. 2014), and because Williams' Title VII/§ 1981 claims fail to state a claim upon which relief can be granted, her LEDL claims would suffer the same fate.

7

(2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) a similarly situated individual outside of her protected class was treated more favorably "under nearly identical circumstances." *Carr v. Sanderson Farms, Inc.*, 665 F. App'x 335, 337 (5th Cir. 2016) (citing *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015)).

The defendants argue that Williams has not adequately alleged that she suffered an adverse employment action. (Doc. 11-1 at 13–16). Specifically, they assert that Williams' allegation that she was denied the opportunity to train for a position in the ICU is insufficient because a denial of training does not constitute an adverse employment action. (*Id.* at 14–15). They also assert that because Williams quit her employment at OLOL, she must allege that she was constructively discharged, and she has failed to meet this burden. (*Id.* at 15–16). In response, Williams argues that the fact that she could not train for an ICU position led to "the denial of the opportunity to advance for and ultimately transfer to a position within the ICU," which constitutes an adverse employment action. (Doc. 15 at 8). This negatively affected Williams' career trajectory and opportunities for future earning. (*Id.*).

"Adverse employment actions" are "ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014) (internal quotation marks omitted). "An employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Id.* (internal quotation marks omitted). Where there is only a "potential, tangential effect on increased compensation," the Fifth Circuit has consistently "held that a failure to train does not constitute an ultimate employment decision or an adverse employment action." *Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 397 (5th Cir. 2016).

8

Here, despite her arguments in briefing, Williams has not alleged that OLOL's failure to permit her to train for an ICU position had any more than a "potential, tangential effect" on her salary. In fact, the amended complaint contains no reference to salary at all, nor does it allege that a transfer to the ICU would be akin to a promotion in some other manner. Williams does not allege that the job duties, compensation, or benefits are in any way substantially different from the Telemetry position she had before she left OLOL. Such allegations, without more, do not demonstrate that OLOL's failure to permit Williams to train for an ICU position constituted an adverse employment action. Williams' response brief argues that "she was denied the increased future earnings that she would have otherwise enjoyed from [an ICU position]," but this is not alleged in the amended complaint. (Doc. 15 at 8). She also argues, again for the first time in briefing, that "[f]rom this ICU training nurses are then able to go into nurse anesthetics training and ICU is generally required prior to the application for anesthesia training." (*Id.*). Leaving aside the question of how an anesthetics position would differ in salary, job duties, or benefits from a Telemetry position, the Court cannot consider facts alleged for the first time in briefing but not in the amended complaint. *Leal v. McHugh*, 731 F.3d 405, 407 n.2 (5th Cir. 2013). Accordingly, Williams has not alleged that she suffered an adverse employment action.

Moreover, the Court agrees with the defendants that Williams' argument that she was "forced" to quit her employment at OLOL is not supported by allegations adequate to make out a viable claim for constructive discharge. Under Title VII, constructive discharge occurs when "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). Courts consider the following seven factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a

younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of early retirement that would make the employee worse off regardless whether the offer is accepted.

*Robinson v. Waste Mgmt. of Tex.*, 122 F. App'x 756, 758 (5th Cir. 2004).

Williams has not alleged facts to support the existence of any of these factors. As already stated, Williams has offered no information regarding the ICU position and how it differed from her Telemetry position. Thus, she asks the Court to simply presume, with no supporting factual allegations, that the ICU position differed in some specific way, either in salary or substantive responsibilities. Moreover, the few instances of "bullying" referenced in the amended complaint, which again are accompanied by scant factual support, do not support an inference that any mistreatment Williams suffered was specifically calculated to drive her from her employment. Thus, Williams has not alleged facts sufficient to support an employment discrimination claim based on a theory of constructive discharge.[4]

### 2. Retaliation

To make out a *prima facie* case of retaliation under Title VII, Williams must allege that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009). For a retaliation claim, an adverse employment action must be "materially adverse," such that it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe. R.R. Co. v. White*, 548 U.S. 53, 68 (2006). The Supreme Court has noted that "it is important to separate significant from trivial harms," and "petty slights or minor annoyances that

---

[4] Because the Court reaches the conclusion that Williams has not stated a viable Title VII employment discrimination claim under either theory of liability, it will not address the defendants' alternative argument that Williams has not adequately alleged facts to support a claim specifically for sex discrimination. (*See* Doc. 11-1 at 16).

often take place at work and that all employees experience" cannot constitute adverse employment actions. *Id.*

Here, Williams has failed to allege either an adverse employment action or the requisite causal connection to support a viable retaliation claim. The first conceivable protected activity occurred between August and September 2016, when Williams complained about being mistreated by white coworkers in the Telemetry unit and met with both the Chief Nursing Officer and Chief Operating Officer to address her desire to train for an ICU position. (Doc. 4 at 4). Afterward, OLOL took no measures to address her concerns and she left her employment over one year later in December 2017. (*Id.* at 4–5). Williams does not allege any particular action by OLOL that would rise to the level of a materially adverse employment action after she first expressed concern regarding her ability to train for position in the ICU. In fact, her primary complaint is that "no action was taken" after she voiced her concerns. (*Id.* at 4).

Williams filed her EEOC charge on July 11, 2017, seven months after she left her employment at OLOL. (Doc. 4-1). She makes a stray reference in the amended complaint to amending her EEOC charge on August 1, 2017, "to show she was being retaliated against by having the EEOC complaint discussed at her hospital." (Doc. 4 at 5). Williams offers no further factual support for this statement. Nevertheless, any "discussion" that took place at OLOL after Williams' departure cannot constitute a materially adverse action for the purposes of an actionable retaliation claim. Accordingly, Williams' retaliation claim is dismissed without prejudice.

D.      **Intentional Infliction of Emotional Distress**

The defendants also claim that Williams' allegations cannot support a plausible state-law claim for intentional infliction of emotional distress. (Doc. 11-1 at 10–12). In response, Williams argues that the allegations that she was denied the opportunity to train for an ICU position and was

subjected to harassment by other coworkers which ultimately caused her to leave are "sufficient to constitute outrageous conduct for the purposes of stating a claim for intentional infliction of emotional distress." (Doc. 15 at 6–7). The Court disagrees.

In Louisiana, intentional infliction of emotional distress constitutes: "(1) extreme and outrageous conduct by the defendant; (2) severe emotional distress suffered by the plaintiff; and (3) the intent by the defendant to inflict severe emotional distress or the knowledge that severe emotional distress was certain or substantially certain to result from the defendant's conduct." *Gressett v. Southwest Airlines Co.*, 216 F. Supp. 3d 743, 748 (E.D. La. 2016) (citing *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991)). All three elements are required for a viable intentional infliction of emotional distress claim. *Id.*

"Louisiana's 'jurisprudence has limited the cause of action in the workplace setting to cases which involve a pattern of deliberate, repeated harassment over a period of time.'" *Dupart v. Savage Servs. Corp.*, No. 19-203, 2019 WL 718734 (E.D. La. Feb. 20, 2019) (quoting *Nicholas v. Allstate Ins. Co.*, 1999-2522, p. 14 (La. 8/31/00), 765 So. 2d 1017, 1026). "Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous." *Nicholas*, 765 So. 2d at 1025. Indeed, "courts require truly outrageous conduct before allowing a claim for intentional infliction of emotional distress even to be presented to a jury." *Id.* at 1024–25. And, importantly, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *White*, 585 So. 2d at 1209. Instead, conduct giving rise to liability "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Williams' allegations are patently insufficient to support a plausible claim for intentional infliction of emotional distress. At most, Williams has alleged that she was denied the opportunity to train for position in the ICU and mistreated by coworkers because of her race and sex, with no accompanying facts remotely rising to the level of "outrageous," "atrocious," or "utterly intolerable." *White*, 585 So. 2d at 1209. And Williams stray references to being "bullied," including once in July 2016 when a coworker allegedly lied about the family of one of Williams' patients requesting a new nurse, far more closely resemble the "mere insults, indignities, threats, annoyance, petty oppressions, or other trivialities" that are insufficient to support a viable claim.[5] Moreover, Williams has failed to allege that she suffered from a "pattern of deliberate, repeated harassment over a period of time." *Nicholas*, 765 So. 2d at 1026. While she alleged that, at an unspecified time, she "had begun to be bullied by the other white nurses on the [Telemetry] unit," she offers no further detail regarding the alleged mistreatment, nor does she allege that it occurred repeatedly over a period of time. (Doc. 4 at 4).

In briefing, Williams asserts that the "outrageousness of the conduct at issue, as well as the severity of the plaintiff's emotional distress, are matters best left to be evaluated and determined by the finder of fact." (Doc. 15 at 7). While this may be partly true, it does not exempt her from pleading "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Indeed, Rule 8 of the Federal Rules of Civil Procedure "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. Accordingly, Williams' claim for intentional infliction of emotional distress is dismissed without prejudice.

---

[5] Williams also alleged that one coworker, Ashley Hayes, behaved in a "condescending manner" toward her and would tell others "how much she hated working with" Williams. (Doc. 4 at 2). This falls into the same category of conduct falling well short of the bar for intentional infliction of emotional distress.

### 3. Leave to Amend

Despite the significant deficiencies outlined above, courts are encouraged to grant leave to amend the complaint once to cure such deficiencies before dismissing a lawsuit with prejudice. *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) ("Although a court may dismiss [a deficient] claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."). Accordingly, the Court dismisses Williams' claims without prejudice and grants her leave to amend the complaint.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** that the Motion to Dismiss (Doc. 11) is **GRANTED**, and Williams' claims for race and sex discrimination and retaliation under both Title VII and the LEDL, as well as intentional infliction of emotional distress, are **DISMISSED WITHOUT PREJUDICE**.[6] It is further **ORDERED** that, to the extent Williams wishes to cure these deficiencies, she shall file an amended complaint **on or before April 23, 2019**. The Court cautions Williams that failure to do so will result in the dismissal of this lawsuit with prejudice.

Signed in Baton Rouge, Louisiana, on <u>March 26, 2019</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[6] Williams seems to assert a claim for hostile work environment under either (or both) state or federal law. (Doc. 4 at 6). The defendants failed to address this claim in briefing, and thus have not moved to dismiss it. Given that all of Williams' remaining claims are dismissed without prejudice, she will also have an opportunity to amend this claim. *See, e.g.*, *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2016) (holding that district courts should only dismiss claims *sua sponte* if the court provides notice of its "intention and an opportunity to respond"). However, the Court cautions Williams that this claim, too, would be dismissed for failure to state a claim upon which relief can be granted because her factual allegations are insufficient to support a viable hostile work environment claim.